### JACK FOSTER v. THE STATE.

*No. 6604. Decided June 15.*

1. **Murder—Evidence.**—On a trial for murder the State was permitted to prove that the deceased owned a pasture traversed by a neighborhood road; that the gate to the pasture, near which the homicide was committed, was frequently left open by unknown parties, and that consequently the deceased, about two weeks before he was killed, removed the gate and stretched wires across the gateway, and that said wires were daily taken down and left down by unknown parties. To this proof the defense objected because the evidence did not connect the defendant with any of the acts of the said unknown parties. But *held*, that in view of the whole evidence, the evidence objected to was properly admitted. It tended to throw light upon the transaction and to explain the presence and conduct of the deceased at the time and place of the homicide.

2. **Same—Charge of the Court.**—The State's witness J. was permitted to testify that the defendant's brother, T. F., in the absence of defendant told him that he, the said T. F., held the deceased while the defendant cut him with a knife. This evidence being hearsay was admitted for the only purpose for which it was competent—to impeach the credibility of the defendant's witness T. F. But the trial court omitted to instruct the jury that the said evidence could be considered by them for the single purpose only of determining the credibility of the said witness T. F., and not as criminative evidence, and this omission was material error.

3.  **Same—Practice—Hearsay Evidence.**—The trial court refused to permit the defense to prove statements about the transaction made by the deceased after he was wounded.   *Held*, that the proposed evidence being purely hearsay it was properly excluded.

4.  **Same—Charge of the Court—Self Defense.**—See the opinion for a charge of the court *held* erroneous because not warranted by any evidence on the trial; and see the statement of the case for evidence demanding of the trial court a comprehensive charge on self-defense.

Appeal from the District Court of San Saba.   Tried below before Hon. A. W. Moursund.

Under an indictment charging him with the murder of Thomas Selman, in San Saba County, Texas, on the 30th day of August, 1886, the appellant was convicted of manslaughter, his punishment being assessed at a term of five years in the penitentiary.

The statement of facts, which covers about one hundred and forty pages of the transcript, may be briefly summarized as follows:

The home place of the deceased was surrounded by his large pasture, which said pasture was traversed by at least one neighborhood road. Until about two weeks before the homicide the said road entered the pasture on the north side through a plank gate.   Several witnesses for the State testified that for a long time preceding the removal of that gate and the substitution in its place of wires nailed across the gateway unknown parties had been in the habit of opening it and leaving it open; and after the substitution of wires, which was about two weeks before the homicide, the same or other unknown parties cut the said wires daily and left them down.   Each and all of the said State witnesses testified that they had never seen the defendant open the gate or cut the wires, and that they had no knowledge upon which to suspect any particular person of those acts.   No eye witness to the tragedy testified for the State, but it was conceded that the fatal cutting took place on the said neighborhood road at the said gate.   It was also admitted by the defense that the fatal cut was inflicted by the defendant on the afternoon of August 30, 1886, and that Selman died that evening about sunset at the house of Riley Smith. The venue was proved by all of the witnesses who testified in the case.

One Manning Clements testified for the State that while horse hunting during the week preceding the killing of Selman he encountered the defendant in the woods not far from that point on the north line of Selman's pasture whence the gate had been recently removed.   No person was with defendant, and there was no road near the place where he then was.   After greeting the defendant the witness asked him what he was doing at that particular out-of-the-way place.   He replied, "We have been busy for a week trying to keep Selman's pasture gate down.   We are going to keep it down or kill every Selman on the creek."   Some time after Selman's death the witness met the defendant at a wedding at Tom

Renfro's place. The wedding was at night. A fire was kept burning in the yard, and in the course of the evening the shifting about of guests left the witness and defendant alone at the fire. Defendant asked witness, "Do you remember what I said to you that day by Selman's gate?" The witness replied that he did, and defendant asked him if he had ever repeated that remark to anybody. Witness replied that he had not, and defendant said to him, "Then for God's sake don't tell it, for if you do it will break our necks."

William Parker testified for the State that a year or two after the death of Selman he met the defendant at the funeral of Anderson Johnson, in McCulloch County. Defendant on that occasion asked the witness to take a walk with him, remarking that he had something to tell witness. When they reached a certain horse lot the witness asked defendant what he had to tell him. Defendant replied that he was in trouble about the killing of Tom Selman. He proceeded then to tell the witness that he and his brother Tom Foster were at the north fence of Selman's pasture, cutting the said fence in order to pass in with their wagon, when Tom Selman, armed with a gun, came up and proceeded to abuse them, and that when Selman raised his gun to strike them, his brother Tom Foster caught the said Selman and held him while he, defendant, killed the said Selman with his knife.

The defense proved by Neil Foster, the father of defendant, that the defendant and his brother Tom left his house on the fatal day to go to Selman's to haul posts for Selman under a previous contract with Selman. Tom rode his pony and defendant drove an ox wagon, which contained "grub," bed clothes, tools, and a water barrel. Late that evening a man named Red Dragoo and Tom Foster came to witness's house, reported the cutting of Selman at the gate, and Selman's request that the witness take his wagon and haul him to Riley Smith's house. Witness went back with them to the gate, where he found Selman sitting on the ground nursing his wounded arm. He and Dargoo put Selman in the wagon and hauled him to Riley Smith's house, where witness left him. Defendant had reached home when Tom and Dragoo arrived.

Tom Foster and Dragoo were the only eye witnesses of the tragedy. Their narratives as to what transpired immediately at the time of the cutting are circumstantially the same. As that of Tom Foster relates the circumstances leading up to the cutting it is given in detail. He testified that under a contract previously entered into with Selman he and the defendant left their father's house on the morning of the fatal day to go to Selman's house to work for him a week hauling poles. They traveled the neighborhood road, which entered the pasture at the south fence, for two reasons—it was the better route, and they were able to get water with which to fill their barrel on that route, and were not on the other and more direct route. About two weeks previous to that day

the plank gate at which the said road entered the pasture was removed and wires were stretched across the space. These wires were secured by being stapled at one end and hooked at the other in such manner that they could be taken down and replaced at will. When they reached the gate the wires were down. They passed in and went to Selman's house via Farris's house, where they took dinner. On reaching Selman's house they were informed that Selman was at work in his field. Witness went to the field, leaving defendant at the house, and got Selman. After some pleasant talk at the house Selman said that he was not ready to have the poles hauled, and it was agreed that witness and defendant would return next week and do the work. Witness and defendant, leaving Selman at his house, then started home the way they had come, witness riding ahead of defendant's wagon. As they approached the gate, the wires still being down, the witness observed Mr. Dragoo approaching the gate from the outside. [From this point the testimony of Dragoo is the same as that of this witness.—Reporter.] Just before reaching the gate the witness heard a voice behind him exclaim, " Oh, yes, boys, you didn't expect to find me here!" Defendant turned his head and, as did witness, saw Selman approaching the wagon with a single barreled shotgun in his hand. Defendant replied to him, " I didn't think anything about it." Selman replied, " I will make you think about it!" and the wagon having stopped, approached within striking distance of defendant, and struck at him with the gun. Defendant caught the gun with his left hand and "slid" out of the wagon, when a struggle for the possession of the gun ensued between him and Selman. Presently Selman let loose of the gun with his right hand and struck defendant a severe blow in the face with his fist. He finally wrenched the gun from defendant's hold and fired it at him. Defendant avoided being shot by knocking the gun aside. He then drew his knife and in the hand to hand fight which ensued cut Selman two or three times on the arm. Selman then cried "enough" and sat down. Defendant got into his wagon and went home. Selman called to Dragoo for help, and Dragoo bound his wounded arm with a handkerchief. Selman then asked that a wagon be procured to remove him, suggesting finally that witness's father's wagon could be obtained. Witness and Dragoo went to witness's house and returned with Neil Foster, witness's father, and the wagon. Neil Foster and Dragoo put Selman in the wagon and took him to Riley Smith's house.

The testimony of the witnesses Tom Foster and Red Dragoo, supported incidentally by proof of other circumstances, presents the case of the defendant. For instance, it was positively testified by Dick and Charley Selman that the wires were *nailed* across the gateway, and not stapled at one end and hooked at the other in a manner that they could be readily taken down and replaced, yet several witnesses for the defense testified that at various times during the ten days preceding the homicide they

passed through that gateway, and always found the wires so stapled and hooked, and never nailed. It was shown also that immediately after the cutting the defendant went to the house of a neighbor and reported the cutting to him, and inferentially that he besought that neighbor's assistance for the wounded man. It was also shown that a special prosecuting attorney, acting in the absence of the district attorney, being unable to attend the inquest on the day after the killing, instructed the county attorney to attend the inquest and file complaint against every person who was present and saw the difficulty, charging each of them with complicity in the killing, in order to disqualify them to "swear the defendant out;" and that, accordingly, every person present, and Neil Foster who was not present, was charged with the offense.

The State introduced N. B. Johnson as a witness to impeach Tom Foster. He testified in substance that he and old man Clements and Tom Renfro took Tom Foster and Dragoo from Neil Foster's house to Riley Smith's house on the morning after the killing to attend the inquest; that he and Tom Foster being left alone for a few minutes at a certain point on the route, the said Foster proceeded voluntarily to state to him the circumstances of the cutting; that the substance of the said Tom Foster's statement was as follows: * * * "When we got to the gate I got down from my horse and laid the wires down, and while I was doing so I looked off to one side of the road and saw Selman hunkered down behind some bushes. I said to Jack, 'There is Selman.' Jack said, 'I don't care if he is.' Selman then came walking up to us with a gun and said, 'Oh, boys, you didn't expect to see me here, did you?' Jack replied, 'We didn't think anything about it.' Selman then began disputing with Jack and drew back his gun to strike him, when I caught him from his back and held his arms while Jack pulled out his knife and did the cutting."

To meet the testimony of the witness Johnson the defense introduced Tom Renfro, who, referring to the journey from Neil Foster's house to Riley Smith's house on the morning of the inquest, testified that he had immediate and personal charge of Tom Foster. He knew as a matter of fact that Tom Foster and N. B. Johnson were not alone together for a single instant during that journey, and he knew that on that trip Tom Foster made no statement whatever about the cutting of Selman to Johnson or anybody else.

*G. W.* and *G. A. Walters,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

Willson, Judge.—Deceased owned a pasture through which there was a neighborhood road. There was a gate on said road opening into

said pasture. This gate was frequently left open by unknown parties. About two weeks before the homicide deceased removed the gate, and in its place stretched wires across the road. These wires were daily taken down and left down by unknown parties. Near this entrance to the pasture and on said road the homicide occurred. On the trial the defendant objected to testimony showing that said gate had been left open, and that said wires had been taken down and left down, because it was not shown that the defendant was in any way connected with these acts, and he reserved a bill of exceptions to the admission of said testimony. We are of the opinion that under the facts of this case the testimony was admissible. It tended to throw light upon the transaction, and was so closely connected therewith as to render it relevant and necessary to a proper understanding of the circumstances of the homicide. It tended to explain the presence and conduct of the deceased at the place and time of the homicide. Hobbs v. The State, 16 Texas Ct. App., 517.

N. B. Johnson, a witness in behalf of the State, testified that on the day after the homicide he had a conversation with Tom Foster, defendant's brother, and who was present at the homicide, in which conversation said Tom Foster stated that he held the deceased while the defendant cut him with a knife. This conversation with Tom Foster did not occur in the presence of the defendant, and was therefore hearsay, and inadmissible as criminative evidence against the defendant. It was admissible for but one purpose—that is, to impeach the testimony of Tom Foster, and for this purpose alone it seems it was offered and admitted. But the court in its charge to the jury omitted to instruct that said testimony could not be considered as criminative evidence, but could be considered for the single purpose only of determining the credibility of the witness Tom Foster. This testimony going to the jury as it did, without any instruction from the court restricting its consideration and effect, was well calculated to, and no doubt did, prejudice and injure the rights of the defendant as criminative evidence. Barron v. The State, 23 Texas Ct. App., 462; Tucker v. The State, Id., 512; Branch v. The State, 15 Texas Ct. App., 96.

It was not error, we think, to reject testimony offered by defendant to prove statements made by the deceased after he was wounded as to the transaction. This was hearsay evidence.

One paragraph of the charge of the court is as follows: "If defendant was on the premises of said Selman at a point where he had no lawful right or permission to be, and by his own voluntary wrongful acts in so being on Selman's premises without any right or permission, or by other wrongful acts injuriously affecting the property of said Selman, caused and provoked the difficulty, then defendant would not be justified," etc. Defendant objects to this portion of the charge upon the ground that it

was not demanded or warranted by the evidence, and we think the objection must be sustained.

It is shown by the evidence that the defendant at the time of the homicide was returning home from deceased's residence, where he had been with a wagon to do some hauling for deceased. He was on the premises of deceased with his permission and as his employe. He was traveling the neighborhood road, a road much traveled, and the most direct road to his home. He had never been forbidden by the deceased to travel said road through said pasture, or notified in any way that it was wrong to do so. There is no evidence that he injured or attempted to injure the property of deceased, or that he had committed or was committing or attempting to commit any trespass upon the premises or property of the deceased. These being the facts, it was material error to instruct the jury as above quoted, and thus present to them an issue not raised by the evidence, and the error was one calculated to mislead the jury prejudicially to the defendant. We think that under the evidence the defendant was entitled to a full, unqualified presentation of the law of self-defense.

There are other questions presented upon the charge of the court which we do not pause to discuss, for the reason that they may not occur on another trial. Neither will we pass upon the sufficiency of the evidence to support this conviction, but will remark that to our minds self-defense, if not conclusively, is persuasively established by it, and we are not prepared to say that upon the evidence as presented in the record we could permit the conviction to stand.

Because of the errors we have specified the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Judges all present and concurring.